## CONTINUATION IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, B. Reese McIntyre, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

### Introduction

1. I have been employed as a Special Agent of the FBI since 2019 and am currently assigned to the Detroit Division, Traverse City Resident Agency. My duties include the investigation of alleged violations of federal criminal laws, including the engaging in abusive sexual contact in violation of 18 U.S.C. § 2244. Prior to becoming an FBI Special Agent, I was employed as a police officer for approximately four and a half years at the Metro Nashville Police Department, located in Nashville, Tennessee.

2. This Continuation is submitted in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of an Apple iPhone cellular phone (the "**Subject Device**") and its contents for the purpose of identifying certain electronically stored data, which is more specifically described in **Attachment B**.

3. The statements contained in this Continuation are based in part on information provided by U.S. federal law enforcement agents, written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents, including local law enforcement agencies, information gathered from investigative sources of information, and my experience, training, and background as a Special Agent.

1

4.      This Continuation is submitted for the limited purpose of obtaining a search warrant. I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the requested search of the **Subject Device** for evidence of the crime of abusive sexual contact involving younger children in violation of 18 U.S.C. § 2244 (c).

## Definitions

5.      "Sexual contact" as defined in 18 U.S.C. § 2246(3), means the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, degrade, or arouse or gratify the sexual desire of any person.

6.      "Special maritime and territorial jurisdiction of the United States" as defined in 18 U.S.C. § 7, includes (1) the high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United Sates and out of the jurisdiction of any particular State.

## Probable Cause

7.      On or about March 17, 2025, B.B, reported to the Grand Traverse Sheriff's Office (GTSO), Traverse City, Michigan, allegations that her father, SCOTT HANCOCK, sexually assaulted her 11-year-old daughter, Minor Victim 1, hereafter referred to as MV-1. B.B also had a 13-year-old daughter, hereafter referred to as Minor Witness 1 (MW-1).

8. On or about April 3, 2025, MV-1 was interviewed at the Traverse Bay Child Advocacy Center by a child forensic interviewer. During the interview, which was observed by the FBI and GTSO, MV-1 disclosed that on two occasions, HANCOCK rubbed her vagina, outside of her clothing, using his finger(s). Additionally, on or about April 17, 2025, the FBI interviewed B.B regarding the incidents.

9. The first incident reported by MV-1 occurred on the Carnival Cruise ship Celebration, later determined by investigators to be on or about May 24, 2024. MV-1, was accompanied on the cruise by B.B, MW-1, and HANCOCK. On the night of the incident, B.B went to a comedy show and left MV-1 and MW-1 in the cabin with HANCOCK. MW-1 was asleep in her bunk while MV-1 was in HANCOCK's bed with HANCOCK, under the bed covers. Among other things, MV-1 reported that HANCOCK was laying behind her in the bed, rubbed her back, and then rubbed her vagina, outside of her clothing, using his finger(s). MV-1 denies that any penetration of her vagina occurred. HANCOCK stopped rubbing MV-1's vagina when B.B returned to the room. MV-1 was awake during the incident but was wearing an eye mask, pretending to be asleep. B.B instructed MV-1 to get in her bed. B.B noted that HANCOCK was awake when she came into the room because she talked to him.

10. The second incident reported by MV-1 occurred on an undetermined date, approximately two to three months after the first incident, at HANCOCK's residence, located in Traverse City, Michigan. MV-1 and MW-1 had a sleepover with HANCOCK. MW-1 slept in the spare bedroom while MV-1 and HANCOCK slept in HANCOCK's bed. HANCOCK was laying in bed behind MV-1, rubbed her back, and then rubbed her vagina, outside of her clothing, using his finger(s). MV-1 told HANCOCK to stop because she wanted to sleep.

3

HANCOCK asked MV-1 if she was going to tell anyone and MV-1 responded "no" or "probably not." MV-1 opined HANCOCK did not want to get in trouble.

11.     On or about April 3, 2025, the FBI and GTSO interviewed HANCOCK at his residence. HANCOCK denied the allegations made by MV-1. HANCOCK told investigators he gave MV-1 "rubs," also referred to as "body rubs," meaning massages. The rubs would occur in HANCOCK's bedroom before they fell asleep. They also occurred at B.B's residence on the couch. The body rubs would include rubbing the legs, feet, head, face, back and/or stomach and would occur when MV-1 was awake. During the first incident, HANCOCK stated he was asleep and could not recall giving MV-1 any rubs. HANCOCK stated that no rubs occurred at all during the entire cruise. Lastly, HANCOCK stated he did not wake up until B.B returned to the room.

12.     According to B.B, HANCOCK, MV-1, MW-1, and herself spent one night in a hotel in Miami, Florida after departing the cruise. The hotel room had two beds. B.B recalled that MV-1 argued with MW-1 about who they were going to sleep in bed with, B.B or HANCOCK, because MV-1 did not want to sleep with HANCOCK.

13.     On or about April 11, 2025, HANCOCK consented to a polygraph examination, which was administered by the Michigan State Police (MSP). During the examination, HANCOCK denied rubbing MV-1's vagina and stated numerous times that he did not remember rubbing MV-1's vagina. However, he also said that he believed that MV-1 was not lying about the situation. HANCOCK also stated, "if I did it, I'm telling you I don't remember it." Based upon the examination, the polygrapher determined that HANCOCK was not being truthful.

4

14. On or about April 17, 2025, B.B provided the FBI with screenshots of text messages and emails between herself and HANCOCK. Among other things, in the messages, HANCOCK stated he informed law enforcement that MV-1 "wouldn't lie and I know that I didn't do that," that he "failed" the polygraph test, "I swear I didn't do it or remember doing it if I did do it…" and "…maybe I don't want to remember! I don't even want to make myself try to remember."



Screenshots from B.B

5



Screenshots from B.B

6

15.     Also included in the screenshots were the boarding passes for B.B, MV-1, MW-1, and HANCOCK, for the May 18, 2024 departure of the Carnival Cruise, along with the cruise's schedule. According to the schedule, Friday (May 24, 2024), believed to be the day of the first incident, the cruise ship was scheduled for "FUN DAY AT SEA." Therefore, it is believed by the Affiant that the incident occurred when the cruise ship was located not in port and in international waters, which is in the "special maritime and territorial jurisdiction of the United States."



Screenshot of cruise schedule

16.     On or about May 6, 2025, in the 86th District Court for the state of Michigan, the Grand Traverse County Prosecutor's Office and GTSO obtained an arrest warrant for HANCOCK for second degree criminal sexual conduct, related to the second incident.

7

17. HANCOCK was taken into custody by the MSP Fugitive Team in Traverse City, Michigan on or about May 8, 2025, without incident. At the time of his arrest and booking into the Grand Traverse County Jail, HANCOCK was in possession of an Apple iPhone cellular phone i.e., the **Subject Device**. At the time of the continuation, the **Subject Device** is being held in HANCOCK's property at the Grand Traverse County Jail, located at 320 Washington Street, Traverse City, Michigan.

18. According to B.B., HANCOCK had an iPhone during the cruise in May 2024. During the trip, HANCOCK had the iPhone in the pocket of his swimming trunks when he accidently fell into the water while they were at the first port at Bonaire. B.B. could not recall if he took any pictures but said he likely did before the incident of falling into the water. After the iPhone was submerged in the water, it still worked but had intermittent issues with the touch-screen. The phone could still charge and receive text messages when they came into ports. B.B. recalled that HANCOCK became irritated because he was receiving text messages from work while on vacation. After the cruise, when they were in Miami, Florida, HANCOCK had the iPhone fixed. B.B. believed HANCOCK still had the same iPhone.

19. In my training and experience, data, such as pictures, files, messages, etc, that is located on cellular phones can be transferred, or backed up from a cloud service, to a newer device in the event an individual gets a new cellular phone. In the event that HANCOCK obtained a new or different iPhone since the cruise, it is likely that data obtained on the iPhone from the cruise ship in May 2024, could still be on HANCOCK's current iPhone.

### Characteristics Common to Individuals with A Sexual Interest in Children

20. Based on my knowledge, experience, and training in abusive sexual contact and child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the illicit sexual conduct.

21. Characteristics common to people involved in abusive sexual contact include that they:

   a. Generally have a sexual interest in children and receive sexual gratification by intentionally touching children's genitalia;

   b. May take photographs that either constitute child pornography or indicate a sexual interest in children by using cameras, video cameras, web cameras, and cellular telephones. Such images and video may be taken with or without the child's knowledge. This type of material may be used by the person to gratify a sexual interest in children.

   c. May correspond with others regarding their sexual interest in children, or accusations of abusive sexual contact with children.

   d. May utilize the internet to access child sexually abusive material (CSAM) or child pornography.

22. I also know from training and experience that people involved in abusive sexual contact with children frequently utilize mobile telephones and other electronic devices, such as tablets, laptops, and desktop computers, to discuss allegations brought against them. Mobile phones often contain evidence of admissions of guilt or regret, in the form of document

9

or notes; and in the case of "smart phones," Global Positioning System (GPS) data indicating the location of the device at given points in time. The location data would also give an indication of the location of the cruise ship when the abusive sexual contact occurred. Further, these types of devices are frequently used to access social media websites such as Facebook, Instagram, etc. In my training and experience, people involved in abusive sexual contact are using social media with increasing frequency to communicate with the victim(s) or the parents of the victim(s).

23. The **Subject Device** will likely contain evidence of text messages, emails, telephone records, and other forms of electronic messages or communications in which HANCOCK discussed the allegations, not just with B.B as demonstrated in this continuation, but other individuals, yet to be known.

24. The **Subject Device** will likely contain additional evidence, to include pictures taken during the cruise, electronic boarding passes, and emails regarding the cruise (i.e. schedules of events, etc).

25. In my training and experience, individuals accused of crimes research the internet for ways to avoid law enforcement action, such as searching for ways to delete electronic evidence, and to convince victims not to disclose.

**Electronic Storage and Forensic Analysis**

26. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed

via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

27.   *Forensic evidence.* As further described in **Attachment B**, this Application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the **Subject Device** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Device** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge

11

about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Device** consistent with the warrant. The examination may require authorities to employ techniques, including, but not limited to, computer-assisted scans of the entire medium that might expose many parts of the device to human inspection in order to determine whether it contains evidence described by the warrant.

29. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## Conclusion

30. Based on the characteristics common among individuals with a sexual interest in children, HANCOCK's possession of the cell phone throughout the cruise, and his text messages discussing the sexual contact, I submit that this Continuation supports probable cause for a search warrant authorizing the seizure and examination of the **Subject Device** described in **Attachment A** to seek the items described in **Attachment B**.